**Jose GONZALEZ, Petitioner,**

v.

**UNITED STATES, Respondent.**

**Scott T. Brackett, Petitioner,**

v.

**United States, Respondent.**

**Nos. CIV.A. 00–11054–WGY, CIV.A. 00–12636–WGY.**

United States District Court, D. Massachusetts.

March 27, 2001.

Bernard Grossberg, Boston, MA, for Petitioner.

Susan M. Poswistilo, United States Attorney's Office, Boston, MA, for Respondent.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

These cases present an extraordinary clash between the attempt of the Massachusetts legislature to provide procedural due process to those accused of crime and the will of the United States Congress to restrict such procedural protections as far as the United States Constitution permits.

Both petitioners, Jose Gonzalez ("Gonzalez") and Scott Brackett ("Brackett") bring their petitions pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. Specifically, Gonzalez and Brackett seek re-sentencing to a lesser term of imprisonment. Their petitions are based on recent decisions by the Massachusetts state courts to vacate their prior state court convictions. At the time of sentencing in this Court, these state court convictions were used as a basis for sentence enhancement. As both men necessarily bring their petitions pursuant to 28 U.S.C. § 2255, they run headlong into the gatekeeping provisions of the Antiterrorism and Effective Death Penalty Act[1] ("AEDPA").

Relying on AEDPA's draconian provisions, the United States has filed a Motion to Dismiss Gonzalez's petition on the grounds that this Court does not have jurisdiction or, in the alternative, that Gonzalez has missed the one-year statute of limitations. Recognizing his precarious position under AEDPA, Gonzalez beseeches this Court to apply the savings clause contained in section 2255 and to allow him to bring a habeas petition pursuant to 28 U.S.C. § 2241 if his section 2255 motion is procedurally barred.

Brackett's petition presents the same procedural quandary but arrives in a dif-

---

**1.** Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (codified in scattered sections of 8, 18, 22, 40, and 42 U.S.C.).

ferent posture. Brackett filed his first petition December 18, 2000, and the Court dismissed the petition as untimely. Brackett seeks reconsideration of that ruling.

## I. FACTUAL BACKGROUND

### A. Jose Gonzalez

Gonzalez was born in Honduras in 1955 but later became a legal resident of the United States. Pet'r's Mem. Ex. L.[2] It seems he frequently skirted the edges of the law. Id. Ex. M. On September 9, 1983, the Malden District Court issued four complaints charging Gonzalez with the offenses of operating after a suspension of a license; possession of a controlled substance with intent to distribute—class B; unlawful possession of a firearm; and possession of marijuana with intent to distribute. Id. Ex. C. Gonzalez pled guilty to each of the offenses, was given fines and a six-month suspended sentence, and was placed on probation. Pet'r's Resp. at 5.[3] Despite the relatively light sentence imposed, these convictions subsequently created significant and severe consequences for Gonzalez.

Before jumping to the federal forum, it is necessary to relate a few important events that occurred in Massachusetts that impact the motion before this Court.

#### 1. *Massachusetts Expands Due Process*

In 1978, the Massachusetts legislature passed a law that required a state court to provide an immigration warning prior to accepting a plea of guilty or nolo contendere. Mass. Gen. Laws ch. 278, § 29D. Thus, defendants in Gonzalez's position were to be told the potential effects of their guilty pleas on their resident status. In 1986, the Massachusetts Supreme Judicial Court held that section 29D warnings applied equally to pleas in the Massachusetts district courts.[4] *See Commonwealth v. Mahadeo*, 397 Mass. 314, 316, 491 N.E.2d 601 (1986). The decision was retroactive.

Fast forward a decade to 1994, when Gonzalez pled guilty in federal court to one count of conspiracy to possess with intent to distribute a quantity of cocaine, and two counts of possessing with intent to distribute cocaine. On February 17, 1995, this Court, concluding that Gonzalez was in a Criminal History Category III under the United States Sentencing Guidelines ("USSG"), enhanced his sentence accordingly and sentenced him to ten years in prison, a term of supervised release of four years, a fine of $12,500, and a special assessment of $150. United States·Mem. at 4. The sentence was affirmed by the First Circuit in October 1995. Based on this sentence, Gonzalez is slated for release in 2003. Pet'r's Resp. Ex. A (Detainer Action Letter).

#### 2. *Enter AEDPA*

Following Gonzalez's conviction, Congress passed AEDPA in the wake of a

---

**2.** Pet'r Mem. refers to the memorandum filed with Gonzalez's first motion for relief docket number 97–11997.

**3.** Pet'r's Resp. refers to the memorandum filed in response to the United States' Memorandum in Opposition to Gonzalez's section 2255 petition.

**4.** The confusion over the scope of the 1978 Massachusetts legislation arises from the fact that Massachusetts then had a "two tier" dis-

trict court practice ·under which a defendant who pleaded guilty could, if dissatisfied with the sentence received, demand a jury trial and thereby automatically withdraw his plea and vacate the original sentence. One unfortunate consequence of this practice was that, since the original plea was functionally nothing more than a trial run, neither counsel nor the court had any particular incentive to observe procedural requirements.

national tragedy. AEDPA's enactment marked the one-year anniversary of the Oklahoma City bombing that took the lives of 168 men, women, and children. The American people were stunned, and Congress reacted to the public outcry. According to Senator Orrin Hatch, one of AEDPA's original authors, AEDPA "represents a landmark bipartisan effort to prevent and punish acts of domestic and international terrorism." 142 Cong. Rec. S3352-01, S3353 (Apr. 16, 1996) (statement of Sen. Hatch). Congressman Henry Hyde described it as "maintain[ing] the delicate balance between liberty and order, between our precious freedoms and defending this country . . . ." 142 Cong. Rec. H3605-04, H3606 (Apr. 18, 1996) (statement of Rep. Hyde).

The AEDPA provisions at issue here were considered key to the effective implementation of the AEDPA goals. They were meant to prevent the countless appeals that often hamper the execution of a sentence. *Id.* The congressional record indicates that habeas reform was specifically tied to the execution of the death penalty:

> Finally, the essence described as that crown jewel of this bill is the reform of habeas corpus for an effective death penalty. The bill sets time limits on the application and considerations of habeas writs; I think that is extremely important. No longer will petition after petition be filed with the courts, delaying endlessly the carrying out of sentences handed down by judges or juries. We have a paradox in our society whereby someone serves on death row for life. If, in fact, we are going to have a strong deterrence, retribution so that the victim can actually feel as though they have been vindicated, we need an effective death penalty. This bill will give it for America.

*Id.* at H3609 (remarks of Rep. Buyer).

The sweep of the so-called habeas "reform" net is much broader, however, catching more than convicted terrorists and petitioners on death row.[5] Gonzalez neither is a terrorist nor was he sentenced to death, yet he falls within AEDPA's far-reaching provisions.

Included within AEDPA is a stringent one-year statute of limitations on section 2255 petitions. 28 U.S.C. § 2255; *Proulx v. Marshall,* Nos. 95-40182-NMG, 99-

---

5. AEDPA and its cousin IIRIRA, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, 110 Stat. 3009-546 (1996) (codified in scattered sections of the U.S.C.), are recent examples of "jurisdiction stripping" legislation, a legislative technique that descends directly from bills proposed in the 1980s to strip federal courts of jurisdiction over abortion and busing, Note, *Powers of Congress and the Court Regarding the Availability and Scope of Review,* 114 Harv. L.Rev. 1551, 1552 (2001). As commentators have noted, "jurisdiction stripping" is, in effect, "rights stripping," Laurence H. Tribe, *Jurisdictional Gerrymandering: Zoning Disfavored Rights out of the Federal Courts,* 16 Harv. C.R.-C.L. L.Rev. 129, 129-30 & n.1 (1981) (arguing that such measures unduly burden constitutional rights); *contra* Erwin Chemerinsky, *Parity Reconsidered: Defining a Role for the Federal Judiciary,* 36 U.C.L.A. L.Rev. 233, 261-69 (1988) (discussing study on parity of state and federal courts), because it removes, in a single stroke, the nuanced views of the 674 federal district judges from the rich common law tradition of evolutionary statutory interpretation and leaves the matter solely to twelve circuit courts of appeal and the Supreme Court. While society—acting through Congress—recoiled from thus rights stripping women and blacks, it had no such hesitancy concerning felons and aliens. Sadly, the fallout from *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), makes it likely that resort to this technique will become more frequent with the concomitant erosion of the very rights a truly independent judiciary was designed to protect.

40129–NMG, 2000 WL 1448600, at *2 (D.Mass. Sept. 25, 2000) (Gertner, J.) ("Effective April 24, 1996, AEDPA amended the statutes governing habeas corpus petitions by imposing a one-year statute of limitations period on the filing of all noncapital habeas petitions in the federal courts."). Gonzalez was thus given one year from the date of AEDPA's enactment to file a motion based on his federal conviction and sentence. Cognizant of this time frame, Gonzalez, acting pro se, submitted his first section 2255 petition in April 1997. The petition raised three claims: (1) that he had received ineffective assistance of counsel; (2) that he had neither knowingly nor voluntarily pled guilty; and (3) that his sentence was based on "materially inaccurate information." Pet'r's First Mot. at 5. This motion was docketed as civil action number 97–10986.

Unfortunately for Gonzalez, his petition was unaccompanied by a memorandum of law and the Court was unimpressed with its bare allegations. On May 12, 1997, the Court issued an order providing that Gonzalez had sixty days in which to file a memorandum to give substance to his claims. After the sixty days had expired, Gonzalez sought an extension, which the Court denied. The petition was dismissed and the case was closed.

Undaunted by, or perhaps unaware of, the denial, Gonzalez sent the Court a memorandum and included a copy of his original petition. The copy of the original petition was docketed under a new docket number: civil action number 97–11997. On September 4, 1997, the Court dismissed the copied petition because it had not been timely filed. Gonzalez appealed.

The First Circuit brought the double docketing to the attention of the Court and Gonzalez. In addition, the First Circuit noted that there was no final judgment in compliance with Federal Rule of Civil Procedure 58 in docket number 97–10986. Thus, the First Circuit suggested that Gonzalez ask this Court to reconsider its denial of an extension of time to support the original petition to treat the memorandum in 97–11997 as a memorandum in support of 97–10986.

Gonzalez followed the First Circuit's suggestions. In a Memorandum and Order dated April 16, 1998, this Court readily recognized its administrative blunder and reconsidered its original decision. While this Court ultimately ruled Gonzalez's petition timely, it was still dismissed. The Court found the petition to be "utterly conclusory and frivolous." United States Mem. at 5. Moreover, a certificate of appealability was denied because Gonzalez failed to make "a substantial showing of the denial of constitutional rights" as required by section 2253.

While the case was whirling about in the federal courts, Gonzalez received verbal notice from the Immigration & Naturalization Service ("INS") that he was slated to be deported based, in part, on his state convictions. The specter of deportation caused Gonzalez to turn his attention to the state courts. On December 5, 1997, within days of the notice, Gonzalez, again acting pro se, filed a motion in the Malden District Court to vacate his sentence. He based his claim on the fact that the court had failed to advise him that his plea could result in deportation. In March 1998, the Malden Court denied his motion. He immediately sought reconsideration. In July 1998, that court advised him that if he obtained an affidavit supporting his claim from the attorney who had represented him in the 1983 proceedings, his case would be reconsidered. Within a month, such an affidavit was submitted to the state court. Pet'r's Resp. Ex. F.

Despite his quick response, the state court inexplicably failed to act. In Febru-

ary 1999, Gonzalez filed a motion in the state court seeking counsel. In March, the motion was granted. *Id.* Ex. G. When appointed counsel failed to contact Gonzalez, he sent a letter in June 1999, again requesting counsel. Finally, in August 1999, counsel entered an appearance on behalf of Gonzalez in the Malden District Court. Within four months, on December 16, 1999, the state court convictions were vacated. The First Circuit has held in *United States v. Pettiford,* 101 F.3d 199 (1996) (Aldrich, J.), that a defendant whose state court convictions have been vacated after a federal sentence is enhanced by such convictions is entitled to a sentence reduction. The court further held that section 2255 is the appropriate vehicle through which to attack the sentence. Therefore, based on the state court decision to vacate his convictions and bolstered by *Pettiford,* Gonzalez filed his present petition on May 23, 2000.

### B. Scott Brackett

Brackett's story is less complex but no less compelling. On July 21, 1997 Brackett pled guilty to conspiracy to distribute and possession with intent to distribute Methamphetamine. Pet'r Mot. for Recons. at 1. As a result of the violation his total offense level was determined to be level 17 and his criminal history category was III. *Id.* Based on these figures, Brackett faced a sentencing range of thirty to thirty-seven months imprisonment. *Id.* Pursuant to § 4B1.1 of the USSG, however, Brackett was deemed a career offender based on two state court convictions. *Id.* at 2. His status as a career offender dramatically altered his sentencing range. As a result, on February 23, 1998 he was

sentenced to 108 months imprisonment and 60 months supervised release. *Id.*

In June 2000, Brackett was successful in vacating the two state court convictions relied upon for career offender status. *Id.* Six months later, Brackett filed a petition under 28 U.S.C. § 2255 seeking a reduction in his sentence. He argues he is now "actually innocent of the career offender status." *Id.* at 2. Relying on AEDPA's one-year statute of limitations, the Court dismissed the petition as untimely. The motion currently before this Court is an appeal for reconsideration of the dismissal pursuant to Federal Rule of Civil Procedure 59. Like Gonzalez, Brackett relies on the First Circuit's decision in *Pettiford* as a vehicle for resentencing.

## II. DISCUSSION

### A. *Gonzalez*

#### 1. Second or Successive

Before this Court can address the merits of Gonzalez's petition, it must traverse the procedural quagmire AEDPA created. Under AEDPA, before filing a second or successive section 2255 petition in the district court, the movant must "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A); *see also id.* §§ 2244(a) and 2255. Because Gonzalez has failed to obtain the requisite approval, the United States argues, his petition must be dismissed. United States Mot. at 4. Gonzalez denies that this petition is "second or successive." Based on this representation, he argues he was not required to seek the permission of the court of appeals prior to its filing. Pet'r's Resp. to United States Mot. at 3, 6.[6]

---

6. Pet'r's Resp. to United States Mot. refers to Gonzalez's response to the Government's mo-   tion to dismiss.

The initial question before the Court is whether this petition is "second or successive" as stated in section 2255 and as interpreted by the courts. At oral argument on July 20, 2000, this Court declared that it was not a "second or successive petition" within the meaning of the statute. Time and intervening case law cast doubt on whether this was a correct assessment. A review of the Court's reasoning and ruling must be made.

Five days following the Court's order from the bench in this case, the First Circuit rendered its decision in *Sustache–Rivera v. United States*, 221 F.3d 8 (1st Cir.2000). The decision served to tighten the analysis used to define "second or successive" in this circuit. The court identified four situations in which a petition is *not* second or successive:

> (1) where the later petition raises the same grounds as a previous petition that had been dismissed as premature; (2) where a state prisoner's later petition raises the same grounds as a previous petition that had been dismissed for failure to exhaust state remedies; (3) where the earlier petition terminated without a judgment on the merits; or (4) where the later petition attacks a different criminal judgment, such as where a prisoner who has successfully brought a first habeas claim is retried, reconvicted, and resentenced and then attacks the new judgment.

*Id.* at 12–13 (citations omitted).

A comparison of the language in *Sustache–Rivera* with the facts of this case indicates that Gonzalez's motion does not fit within the enumerated exceptions to the "second or successive" bar. The current section 2255 petition does not raise the same grounds as his previous petition, a fact the record reveals and Gonzalez concedes. Moreover, the original section 2255 petition was decided on its merits, as evidenced by the April 16, 1998 Order of this Court that ruled the petition completely "conclusory and frivolous." Clearly, the situations identified in (2) and (4) of the *Sustache–Rivera* list are inapplicable to the case at bar.

Admittedly, the list compiled in *Sustache–Rivera* is not exclusive. *Norton v. United States*, 119 F.Supp.2d 43, 44 n.1 (D.Mass.2000) (recognizing that the First Circuit has not definitively addressed the meaning of second or successive). Gonzalez argues that an additional exception should be carved out where a prisoner could not have presented his claim in an earlier petition. This is an attractive argument. Indeed, it is the one the Court found persuasive when it originally decided this issue.

Sustache, however, advanced the same argument to the First Circuit. He asked the court to characterize *literally* second petitions as first petitions if the claims could not reasonably have been presented earlier. Sustache was charged with, and convicted of, three carjackings. At the time of his trial, the question of whether serious bodily injury occurred in a carjacking was not presented to the jury but was decided by the judge at sentencing. *Sustache–Rivera*, 221 F.3d at 10. In *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), the Supreme Court held that the bodily injury requirement was an element of the offense and thus had to be submitted to a jury. Sustache filed his technically second petition based on the new Supreme Court ruling in *Jones*.

Initially, the First Circuit appeared unimpressed by this argument. The court dismissed Sustache's contention that support for his argument could be found in First Circuit precedent. *Sustache–Rivera*, 221 F.3d at 13 (countering Sustache's argument that the language of *Pratt v. Unit-*

*ed States,* 129 F.3d 54 [1st Cir.1997], and *United States v. Barrett,* 178 F.3d 34 [1st Cir.1999] supports his position). Significantly, this is the case law relied on by this Court in its initial ruling. Further, the court noted that other courts of appeals "have routinely treated as second or successive claims alleged to be 'new' due to the Supreme Court changing the law." *Id.* at 14. In the next paragraph, however, the court switched gears, and recognized that Sustache's position "avoids some sense of unfairness, and the Supreme Court has not yet ruled on it." *Id.*

Ultimately, the court left the question undecided: "In any event, although we think the argument questionable, we do not decide the issue, but only note that the premise of Sustache's argument—that he lacked reasonable opportunity to argue that serious bodily injury was an element of the crime—is itself a difficult question." *Id.* According to the *Sustache–Rivera* court, however, regardless of whether Sustache's petition was a first or a second petition, his claims still failed on the merits.

The First Circuit's indecision breathes just enough life into Gonzalez's claim to keep it alive. Or so Gonzalez argues. In contrast to Sustache, of course, Gonzalez's present petition appears meritorious. Under *Pettiford* he is entitled to resentencing, and now that his prior convictions have been vacated, his sentence is unlikely to exceed 97 months. USSG Ch.5, Pt.A (Sentencing Table) (1994).[7] It thus appears that Gonzalez is entitled to be released from custody either immediately or in the

---

**7.** One can be fairly confident in predicting a sentence that will not exceed the 97 month guideline ceiling because the First Circuit so rigorously frowns on departures, *e.g. United States v. Thompson,* 234 F.3d 74 (1st Cir. 2000); *United States v. Martin,* 221 F.3d 52 (1st Cir.2000), that it is now almost dead last among the federal circuits in its approval of challenged departures. U.S. Sentencing Commission, 1998 Datafile, OPAFY98, United States Sentencing Commission, Federal Sentencing Statistical Report Prepared for the Honorable William G. Young tbl. 8 (Nov. 2000).

This, of course, does not mean that sentencing is any more uniform within the First Circuit than elsewhere. It is not. Rather, our circuit's attempt to toe the line has led to the somewhat unpredicted result that virtually standardless departures for "substantial assistance," United States Sentencing Commission, *Guidelines Manual,* § 5K.1.1 (Nov.2000), are here routine. *See, e.g.,* Lisa M. Farabee, *Disparate Departures Under the Federal Sentencing Guidelines: A Tale of Two Districts,* 30 Conn. L.Rev. 569, 591–94 (1998) (comparing the wide use of substantial assistance departures in the First Circuit with their non-use in the Second Circuit with its well developed departure jurisprudence). Furthermore, charge bargaining is rampant, *e.g.,* Ilene H. Nagel & Stephen J. Schulhofer, *A Tale of Three Cities: An Empirical Study of* *Charging and Bargaining Practices under the Federal Sentencing Guidelines,* 66 S. Cal. L.Rev. 501, 502 (1992) ( [W]hen judicial discretion at sentencing is constrained, there is a concomitant increase in prosecutorial charge bargaining.), and fact bargaining is a "dirty ... secret," Tony Garoppolo, *Fact Bargaining: What the Sentencing Commission Has Wrought,* 10 Crim. Prac. Man. (BNA) 405, 405 (Oct. 9, 1996) ( [The] widespread use of fact bargaining, and the lying to the court that is inevitable with the frequent use of such bargaining, is the dirty little secret in the prosecution of federal criminal cases.); *contra* Stephen J. Schulhofer & Ilene H. Nagel, *Negotiated Pleas Under the Federal Sentencing Guidelines: the First Fifteen Months,* 27 Am.Crim. L.Rev. 231, 272 (1989) ("In response to direct questions about fact-bargaining, most AUSAs and nearly all supervisors flatly denied its existence."), even though fact bargaining is sought to be prohibited by the sentencing guidelines themselves, USSG Ch.1, Pt.A, ¶ 4(a) (describing the United States Sentencing Commission's balance between real offense and charge offense sentencing); *see also* Paul Craig Roberts & Lawrence M. Stratton, *The Tyranny of Good Intentions* 85–93 (2000) (decrying our current system of plea bargaining).

near future. But *Pettiford* is of little solace to Gonzalez now. Today, AEDPA's procedural hurdles stand between him and any resolution on the merits.[8]

Indeed, the obvious merits of Gonzalez's claim appear to be of little or no consequence after AEDPA. Petitioners seeking reprieve from AEDPA's harsh second or successive provision have met with little sympathy from the courts. Under the rubric of congressional intent, federal courts have consistently rebuffed prisoners' attempts to circumvent the procedural prerequisites to a hearing on the merits. For example, in *In re Dorsainvil,* 119 F.3d 245 (3d Cir.1997), the petitioner was denied the opportunity to bring a numerically second petition even though an intervening Supreme Court case interpreting the statute under which he was convicted cast doubt on the validity of his conviction, *id.* at 248. Although, arguably, Dorsainvil was imprisoned for conduct no longer deemed criminal, the gatekeeping provisions in AEDPA denied him relief. *Id.; see also In re Davenport,* 147 F.3d 605, 610 (7th Cir. 1998); *Triestman v. United States,* 124 F.3d 361, 367–70 (2d Cir.1997). While the First Circuit in *Sustache–Rivera* declined explicitly to adopt the rigid reasoning of these decisions, a fair reading of the case strongly indicates that it may. *Sustache–Rivera,* 221 F.3d at 14. *See also Norton,* 119 F.Supp.2d at 44 n. 1 (declining to extend exceptions to allow second petition that raises "new" issues of constitutional law).

■ Regardless, there is no controlling precedent on the facts before this Court, and thus the question remains whether Gonzalez's plight supports an additional exception to the second or successive rule.

Gonzalez vehemently argues that he was unaware of the infirmity in his state court convictions until, at the earliest, he received notice from the INS in November 1998. Thus, it was impossible for his 1997 habeas petition to contain such an allegation. In essence, the AEDPA provisions placed Gonzalez between a rock and a hard place. He was forced to bring his first habeas petition by April 1997 or lose the claims of which he was then cognizant. Now AEDPA prevents him from bringing a second petition. According to Gonzalez the facts of his case demand an exception to the second or successive bar.

There is little to no support for Gonzalez's position in the growing habeas case law. Congress created only tiny safe harbors for prisoners with meritorious claims marred by procedural miscues. 28 U.S.C. § 2255. The courts interpreting "second or successive" have, for the most part, been true to its literal meaning. In most situations where the petition was heard despite a previous petition, the merits of the case had been raised in an earlier petition but never addressed. *E.g., Stewart v. Martinez–Villareal,* 523 U.S. 637, 643, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998); *Sustache–Rivera,* 221 F.3d at 12–13. Although *Sustache–Rivera* left the question of additional exceptions unanswered, the tenor of the opinion and the case law from other circuits suggests that the First Circuit is unlikely to expand the limited list of exceptions to the second or successive bar.

Moreover, Gonzalez was first made aware that his state court convictions were potentially infirm in November 1997, and he first petitioned the Malden District Court in December of that year. Thus,

**8.** Nor does the First Circuit's recent decision in *United States v. Snyder,* 235 F.3d 42, 52–53 (1st Cir.2000), aid Gonzalez. While the First Circuit reiterated the holding in *Pettiford* and

confirmed it as good law, it did not address AEDPA. There is nothing in *Pettiford* nor *Snyder* to suggest that AEDPA's procedural bars fall away when a conviction is vacated.

Gonzalez was aware of a potential challenge to his state court convictions while this Court was still considering his first federal habeas petitions, and could, therefore, have amended his motion pursuant to Federal Rule of Civil Procedure 15(a).

■ A district court lacks subject matter jurisdiction to entertain an unapproved second or successive section 2255 petition and must either dismiss it or transfer it to the appropriate court of appeals. *United States v. Barrett*, 178 F.3d 34, 41 (1st Cir.1999). For the foregoing reasons Gonzalez's motion for reconsideration of his section 2255 petition is TRANSFERRED to the United States Court of Appeals for the First Circuit pursuant to 28 U.S.C. § 1631. Because this Court lacks subject matter jurisdiction, it does not address whether the one-year statute of limitations bars Gonzalez' petition.

2. Savings Clause

Gonzalez, in a last effort to keep his petition alive, argues that his claim fits within the savings clause of section 2255. Congress allowed a petitioner, whose remedy under section 2255 was "inadequate or ineffective," to apply for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. The burden is on Gonzalez to establish that his remedy under section 2255 is inadequate or ineffective. *Pack v. Yusuff*, 218 F.3d 448, 452 (5th Cir.2000); *Charles v. Chandler*, 180 F.3d 753, 756 (6th Cir.1999). Unfortunately, the exact parameters of "inadequate or ineffective" have yet to be defined.

■ One thing is clear. In this circuit as well as others, a petition under section 2255 cannot become "inadequate or ineffective" merely because a prisoner cannot meet the second or successive requirements of AEDPA or because his petition is deemed untimely. *Sustache–Rivera*, 221 F.3d at 16 n. 13; *United States v. Barrett*, 178 F.3d 34, 50 (1st Cir.1999). While the First Circuit has determined that habeas corpus relief under 2241 remains available for federal prisoners, it has not resolved the scope of the savings clause. *Sustache–Rivera*, 221 F.3d at 17 & n. 13.[9]

To date, the Supreme Court has not provided much guidance as to the factors that must be satisfied to file a section 2241 petition. Several circuits have attempted to define the "inadequate and ineffective" language, indicating that it applies only in the most extraordinary circumstances. *See, e.g., Reyes–Requena v. United States*, 243 F.3d 893, 902–03 (5th Cir.2001); *In re Jones*, 226 F.3d 328, 333–34 (4th Cir.2000); *Wofford v. Scott*, 177 F.3d 1236, 1243 (11th Cir.1999); *In re Davenport*, 147 F.3d 605, 608 (7th Cir.1998); *Triestman v. United States*, 124 F.3d 361, 363 (2nd Cir.1997) *Dorsainvil*, 119 F.3d at 249. The majority of these cases examined the scope of the savings clause in response to the Supreme Court's decision in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), a retroactively applicable decision narrowly interpreting 18 U.S.C. § 924(c)(1). The petitioners in these cases were viewed as falling within the savings clause in part because, in essence, they were convicted of non-existent offenses. Thus, in each case, the petitioner could claim that he was actually innocent of the crime of which he was convicted.

Gonzalez does not argue that he is innocent of his underlying convictions. He claims he is innocent of the crimes used to enhance his sentence. In both instances, a petitioner is being held in contravention of

---

9. One undetermined procedural issue is whether the determination of inadequate and ineffective is made by the sentencing court or the custodial court. In this instance, the District of Massachusetts is both, so the Court need not answer this question.

the laws of the United States. In one scenario, the petitioner is imprisoned for conduct for which she is innocent; in the other scenario, she is imprisoned *longer* because of conduct of which she is innocent. In either event, her liberty has been stripped.

The Court need not determine whether being innocent of state court convictions fits within the paradigm created by courts for actual innocence of the underlying conviction. Before the savings clause is invoked, a petitioner must show that he was unable to bring his claim earlier. *Sustache–Rivera*, 221 F.3d at 17. As the previous discussion indicates, Gonzalez actually had an opportunity timely to present this claim. He was aware of the infirmity of his state court convictions at the time his original petition was still before this Court. Contrary to his argument, he was not required to wait until his convictions were vacated before raising the issue in a section 2255 motion. *See McCarthy v. United States*, 1998 WL 1085766, at *1 (1st Cir. Dec. 18, 1998) (unpublished opinion).[10]

As a result, Gonzalez must show cause and prejudice for his failure to have previously made the claim. *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *Sustache–Rivera*, 221 F.3d at 17. The cause and prejudice standard announced by the Supreme Court in *Bousley*, is especially stringent. In *Bousley*, petitioner pleaded guilty to use of a firearm pursuant to section 924(c)(1).

*Id.* at 616, 118 S.Ct. 1604. After his guilty plea, the Supreme Court narrowed the meaning of "use," and thus removing the petitioner's conduct from the scope of the statute. *Id.* at 617, 118 S.Ct. 1604. Petitioner, however, had failed to raise his claim on direct review, and he was thus procedurally defaulted from raising it in his habeas petition. *Id.* at 622–23, 118 S.Ct. 1604. Bousley argued, and not unreasonably, that at the time of his appeal his claim was not available. The Supreme Court considered the argument to be without merit because the issue, while undecided prior to his plea, was very much in contention among the circuits. Essentially, nothing prevented Bousley from raising his claim earlier even if within the Ninth Circuit it was futile. *Id.*

Like Bousley, Gonzalez argues that he was unable to bring his claim earlier. Like the Supreme Court, this Court must rule Gonzalez's argument to be without merit. There was nothing that prevented Gonzalez from raising the inappropriate enhancement at an earlier date. While the petition for resentencing may have been futile as to the merits, it would have preserved his claim.[11]

Beyond the procedural bars, Gonzalez adduces no evidence that his remedy under section 2255 was inadequate or ineffective nor that his delay in bringing his claim was for cause. Gonzalez simply asserts that "[f]undamental fairness demands that the petitioner here at least be given the

---

10. For the propriety of citing an unpublished decision, see *Anastasoff v. United States*, 223 F.3d 898, 899–905 (8th Cir.) (R. Arnold, J.) (holding that unpublished opinions have precedential effect), *vacated as moot*, 235 F.3d 1054 (8th Cir.2000), *Giese v. Pierce Chem. Co.*, 43 F.Supp.2d 98, 103 (D.Mass.1999) (relying on unpublished opinions' persuasive authority), and Richard S. Arnold, *Unpublished Opinions: A Comment*, 1 J.App. Prac. & Process 219 (1999). It is especially unfortunate that

the First Circuit saw fit to designate an opinion as important as *McCarthy* as unpublished.

11. The current habeas jurisprudence instructs petitioners and their counsel to adopt the "everything but the kitchen sink approach" to petitions under section 2255. To preserve claims, even those presently without merit or premature, petitioners must anticipate and argue every angle in a single first petition on the off chance that the law may shift in the future.

opportunity to present his claims and therefore, his claim should be found to fit within the savings clause." Pet'r's Resp. to United States Mem. at 15. Fundamental fairness, however, is not a winning argument in the face of AEDPA.

Nevertheless, Gonzalez' reliance on "fundamental fairness" has merit. He received the congressionally prescribed sentence for his crimes. Congress allowed for sentence enhancement based on state convictions. Gonzalez received the statutorily required enhancement. By the same token, Supreme Court and First Circuit precedent allows a prisoner to be resentenced if his state court convictions are vacated. Gonzalez' state court convictions have been vacated. Thus, the enhancement he received is no longer valid. In essence, Gonzalez is serving a sentence beyond that required by law. Yet AEDPA prevents him from being re-sentenced.[12] Is this justice or what?

### B. *Brackett*

Unlike Gonzalez, this is Brackett's first petition for habeas relief. Thus, he avoids the mess wrought by the second or successive analysis. His petition is not free to be heard on the merits, however. First, Brackett must contend with AEDPA's statute of limitations.

AEDPA amended section 2255 to include a one-year statute of limitations for collateral appeals under that section. The time limit is triggered by one of four events:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255. Brackett argues that the instant petition is timely pursuant to

---

**12.** Can Congress have intended this result when it passed AEDPA? A fair reading of the congressional record indicates that the answer is "yes." The congressional debate was fully informed, and the record is replete with objections to these provisions:

> In my view, the attacks on habeas corpus included in this legislation that purports to address the terrorist threat is so objectionable I must oppose this bill . . . . Throughout my career, I have believed in and fought for the protection of all Americans' fundamental rights under habeas corpus. As Chief Justice Salmon P. Chase described it in *Ex Parte Yerger*, 75 U.S. 85, 8 Wall. 85, 19 L.Ed. 332 (1868), habeas corpus is the most important human right in the Constitution and the best and only sufficient defense of personal freedom. As a nation, we cannot

afford to compromise the cherished habeas corpus protections guaranteed each of us in the U.S. Constitution.

142 Cong. Rec. E592–02, E592 (Apr. 18, 1996) (remarks of Rep. Stokes). Congresswoman Patsy Mink of Hawaii stated "I disagree with the restrictions of habeas corpus and fully expect they will be expunged by the courts as unconstitutional." 142 Cong. Rec. E645–04, E646 (Apr. 18, 1996) (statements of Rep. Mink).

It is difficult to see how resentencing Gonzalez as the law requires threatens order or undermines liberty. Yet Congress has declared otherwise. Until Congress revisits AEDPA, this Court must follow the law as written by the legislature and interpreted by the courts.

either paragraph 2 or paragraph 4 of section 2255. Pet'r's Mot. for Recons. at 4.

■ Pursuant to paragraph 2, Brackett asserts that the impediment to filing his claim was not lifted until June 2000 when his state court convictions were vacated. Not so. Brackett gives section 2255 too generous a reading. There was no "governmental action" that prevented him from filing this petition. The jurisprudence developed under AEDPA anticipates premature claims. Indeed, section 2255 allows for premature or unripe claims to be filed within the statutory time limit and then heard on the merits later. *McCarthy v. United States*, 1998 WL 1085766, at *1 (1st Cir. Dec. 18, 1998) (unpublished opinion). In *McCarthy*, the First Circuit explicitly allowed for a section 2255 motion prior to the state court convictions being vacated. *Id.* "In the event that McCarthy succeeds in vacating his state court convictions, his contention that the [Armed Career Criminal Act] is inapplicable to him would become ripe. It would appear that, in that event and at that time, he could seek to reopen this § 2255 proceeding and obtain a district court adjudication of that previously raised claim." *Id.*

Brackett concedes that he started the process of vacating his state convictions prior to the imposition of his federal sentence. Pet'r Mot. for Recons. at 5. Thus, he was aware of their potential vulnerabilities well before the date on which the judgment of his conviction became final. Granted, any motion filed prior to his convictions being vacated would have been dismissed as premature. Nonetheless, there was no governmental action within the meaning of section 2255 that prevented him from making the motion.

■ Brackett's claim under paragraph 4 is more murky. Paragraph 4 states that the time period begins to run on the date on which the facts supporting his claim could have been discovered through the exercise of due diligence. According to Brackett, the "fact" supporting his claim is the state court's decision to vacate his convictions in June 2000, an outcome he diligently pursued from the time of his arrest on the federal charges. The claim he brings is that he is actually innocent of a career offender designation. Under Brackett's theory he has until June 2001 to file his habeas petition.

Brackett's reasoning mirrors the analysis adopted by Chief Judge Hornby in *United States v. Cavallaro*, No. CRIM. 95–59–P–H, 2000 WL 230225, at *1 (D.Me. Feb. 9, 2000). Cavallaro was sentenced on June 2, 1997. *Id.* Nearly two years later, on March 9, 1999, his Massachusetts state court convictions were vacated. *Id.* On May 4, 1999, Cavallaro filed his section 2255 motion attacking his federal sentence. *Id.* Like Brackett, he argued his petition was within the statute of limitations because the fact on which his claim was based was not discoverable until March 4, 1999. Chief Judge Hornby agreed:

> Under its plain language, Cavallaro's motion is timely. The "claim" he presents here is that he is not a career offender. The "facts" supporting that claim is the Massachusetts court decision of March 9, 1999, vacating the Massachusetts convictions. The elimination of the Massachusetts convictions was not discoverable until March 9, 1999.

*Id.* The court commented that "Congress and the Sentencing Commission have chosen to make federal sentences depend mechanically upon state sentences. The cost of this approach, whatever its benefits, is that the federal sentences are as fragile as their state sentence underpinnings." *Id.*

It is tempting to adopt Chief Judge Hornby's reasoning and analysis. It allows for a sense of justice that is lacking

after AEDPA's passage. The inequity is especially apparent when the Court receives pro se petitions from prisoners lacking the resources to retain counsel.[13] AEDPA and its accompanying case law is difficult to untangle even for those well versed in the law. At first glance it makes sense that Cavallaro—and in this case, Brackett—waited until his state convictions were vacated before bringing his section 2255 petition. Indeed, the language of *Custis v. United States*, 511 U.S. 485, 497, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994) and the First Circuit's decision in *Pettiford*, 101 F.3d at 200–201, suggest that a prisoner wait until after she has attacked successfully her state convictions before seeking resentencing. But both *Custis* and *Pettiford* were decided prior to AEDPA. Thus, the analysis was made under a kinder, gentler habeas statute.

Respectfully, this Court cannot agree with the analysis in *Cavallaro*. The outcome is contrary to the intent of Congress to impose stringent limitations to habeas relief and provide finality to federal sentences. Moreover, it appears to counter emerging First Circuit law. In *Pettiford*, the case upon which Brackett relies to support his resentencing, the First Circuit commented on this very issue. Although the court acknowledged the "surprising infirmity of convictions initially reached in the courts of the Commonwealth," *id.* (citing *United States v. Payne*, 894 F.Supp. 534, 537 n. 7 [D.Mass.1995]), it was unconcerned with the potential floodgate effect of permitting resentencing. The *Pettiford* court noted "[t]he one year limitation contained in the recent amendment of § 2255

will diminish this problem." *Id.* Thus, the First Circuit anticipated that petitioners seeking resentencing based on recently vacated state court convictions would be blocked by AEDPA's one-year statute of limitations.

This is not to say petitioners in Brackett's position are precluded from seeking habeas relief. In *McCarthy*, the petitioner "sought to raise an, as yet, unripe claim regarding his status as an armed career criminal. Concerned about the one-year period of limitation in § 2255 imposed by [AEDPA], MaCarthy included his unripe claim in his § 2255 motion." *McCarthy*, 1998 WL 1085766, at *1. According to the First Circuit, once McCarthy succeeded in vacating his state court convictions his claim would become ripe, and he could seek to reopen his section 2255 petition.

Thus, the Court rules that Brackett's section 2255 motion is untimely under AEDPA's one-year statute of limitations. While this outcome is harsh, it is in keeping with congressional intent and the procedural limits imposed by AEDPA.

The Court's ruling was anticipated by Brackett. In the event his Motion for Reconsideration failed, Brackett requested this Court to order a Certificate of Appealability allowing him to seek review of the decision in the First Circuit. 28 U.S.C. § 2253. Pursuant to section 2253 an appeal from the final order in a proceeding under section 2255 cannot be taken without a certificate of appealability. *Id.* A certificate of appealability may be issued only if the applicant has made a "substan-

---

**13.** The First Circuit addressed at least one such inequity in *Raineri v. United States*, 233 F.3d 96 (1st Cir.2000), in which it held that a district court could not *sua sponte* recharacterize a motion for post-conviction relief as a section 2255 petition, *id.* at 100. When pro se prisoners make motions for post-conviction

relief, they are often wholly unaware of the fact that, if characterized as a section 2255 petition, such motion triggers AEDPA's strict second and successive requirements for all subsequent petitions. Thus, prior to *Raineri*, prisoners would be closing the door to almost all future relief without even knowing it.

tial showing of the denial of a constitutional right." § 2253(c)(2).

■ There remains a genuine issue whether this Court's interpretation of AEDPA's statute of limitations is accurate. . *Contra, e.g., Cavallaro,* 2000 WL 230225, at *1. If it is not, Brackett's motion is timely and he has the right to be resentenced. Under the Sentencing Guidelines, Brackett is eligible for release immediately. Courts have noted that "[t]o afford a petitioner no relief, when he has been sentenced to an enhanced period based on prior state convictions that were obtained in violation of the United States constitution, is arguably itself a constitutional violation." *Pettiford v. United States,* No. 94–12626, 1995 WL 464920, at *10 (D.Mass. July 20, 1995) (Keeton, J.), *aff'd,* 101 F.3d 199 (1st Cir.1996), *accord United States v. Tucker,* 404 U.S. 443, 447–49, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (allowing resentencing when federal sentence founded at least in part on the materially inaccurate assumptions of constitutional magnitude regarding prisoner's state criminal record). Moreover, serious constitutional questions are raised when a petitioner can prove his innocence but is procedurally barred from judicial review. *Triestman,* 124 F.3d at 363.

Based on the foregoing, the Certificate of Appealability is GRANTED.

## III. CONCLUSION

Both petitioners are serving sentences enhanced by invalid state court convictions. Although both petitioners are likely eligible for release, the procedural bars in AEDPA prevent resentencing. Because Gonzalez's petition is second or successive within the meaning of AEDPA, this Court lacks jurisdiction. Accordingly, the case is TRANSFERRED to the United States Court of Appeals for the First Circuit pursuant to 28 U.S.C. § 1631 [docket no. 1].

Brackett's Motion for Reconsideration [docket no. 3] must be DENIED, as his section 2255 petition was untimely. He is, however, granted a Certificate of Appealability pursuant to section 2253(c)(2).