**Dean DELAVENTURA, on behalf of Himself and all others similarly situated, Plaintiffs,**

v.

**COLUMBIA ACORN TRUST; Columbia Funds Trusts I–IX, Defendants.**

**No. CIV.A.05–10793 WGY.**

United States District Court, D. Massachusetts.

Feb. 1, 2006.

John C. Martland, Martland & Brooks LLP, Saugus, MA, David Pastor, Gilman and Pastor, LLP, Boston, MA, Stephen Rabin, Rabin Peckel, LLP, New York City, for Dean Delaventura, Plaintiffs.

Giselle J. Joffre, Ropes & Gray LLP, Brian E. Pastuszenski, Goodwin Procter LLP, Boston, MA, for Columbia Funds Trust I, Columbia Funds Trust II, Columbia Funds Trust III, Columbia Funds Trust V, Columbia Funds Trust VI, Columbia Funds Trust VII, Columbia Funds Trust VIII, Columbia Funds Trust XI, Defendants.

## MEMORANDUM

YOUNG, District Judge.

It is the province of the Congress so to allocate jurisdiction and venue among the 94 United States District Courts as to "secure the Blessings of Liberty to ourselves and our Posterity," U.S. Const. pmbl., and achieve the "just, speedy, and inexpensive determination of every action,"[1] Fed.R.Civ.P. 1. It is the province of the competent attorney to shop for a forum believed best suited to the client's cause. It is the province of the federal

---

**1.** The extent of the congressional power in this regard has been an issue throughout the history of the Republic. *See generally* Michael G. Collins, *The Federal Courts, the First Congress, and the Non–Settlement of 1789*, 91 Va. L.Rev. 1515 (2005). Occasionally, Congress uses its powers to "regulate" the courts' jurisdiction simply to strip disfavored classes of access to a judicial branch Congress mistrusts. *See, e.g., Gonzalez v. United States*, 135 F.Supp.2d 112, 115 n. 5 (D.Mass.2001) (discussing the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (codified in scattered sections of 8, 18, 22, 40, and 42 U.S.C)); *Enwonwu v. Chertoff*, 376 F.Supp.2d 42, 78–85 (D.Mass.2005) (discussing the provisions of the REAL ID Act of 2005, Pub.L. No. 109–113, Div. B., 119 Stat. 231, § 106, that strip the district courts of habeas jurisdiction over certain aliens facing deportation). It is reported that, having successfully eliminated the district courts, the executive will move on to eliminate the circuit courts as well. To the extent that jurisdiction continues to inhere in the courts of appeal, the executive is already

judiciary fairly to mediate between the aspiration and the reality.

Since all 94 district courts follow identical rules concerning discovery and trial preparation, one excellent innovation in civil practice is the idea that a single judge might manage a number of "related" cases, getting them all ready for trial in a uniform manner and returning the "trial-ready" cases from whence they came (i.e., to the district courts with proper jurisdiction and venue) for trials before local juries.

## I. Multi–District Litigation.

This excellent innovation has been codified by statute—28 U.S.C. § 1407(a)—which provides:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated . . . .

So, multi-district litigation ("MDL") practice was born.

In order for a case to be transferred, the civil actions pending in different judicial districts must have one or more questions of fact in common. 28 U.S.C. § 1407(a). Additionally, the transfer must be convenient for the parties and the witnesses and must promote justice and efficiency. *Id.*

As in the present case, MDL is "used to manage mass torts." James M. Wood, *The Judicial Coordination of Drug and Device Litigation,* 54 Food & Drug L.J. 325, 337 (1999); *see* Desmond T. Barry, Jr., *A Practical Guide to the Ins and Outs of Multidistrict Litigation,* 64 Def. Couns. J. 58, 66 (1997) (stating that "the procedures are intended only as a guide to promote the fair and efficient resolution of complex litigation"); *id.* at 59 (noting the purpose of MDL is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses and the courts").

The Judicial Panel on Multi–District Litigation has the authority to "centraliz[e] . . . cases in a single district called the transferee district for pretrial management . . . ." Gregory Hansel, *Extreme Litigation: An Interview With Judge Wm. Terrell Hodges,* 19 Me. B.J. 16, 18 (2004) (emphasizing that transfers are for pretrial management only).[2] The judicial panel is "neither a trial court, appellate tribunal, nor (as some have called it) a mysterious 'Super Court.' Rather, it is simply a special judicial creature comprised of seven federal district or appellate court judges . . . ." Earle F. Kyle, IV, *The Mechanics of Motion Practice Before the Judicial Panel*

---

arguing that it—not the judiciary—must do the constitutional fact finding. *See* Oral Arguments, *Enwonwu v. Gonzales,* No. 05–2053 (1st Cir. Jan. 11, 2006). At some point, of course, such restrictions on habeas jurisdiction implicate the Suspension Clause of the Constitution. U.S. Const. art I, § 9, cl. 2.

**2.** MDL is said only to "concentrate," *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 762, 790 (E.D.N.Y.1980), or "centraliz[e]," Hansel, 19 Me. B.J. at 18, cases for pretrial proceedings rather than permanently consolidate them.

*on Multidistrict Litigation,* 175 F.R.D. 589, 589 (1998).

The panel considers a large number of cases, including patent and antitrust cases, and claims against pharmaceutical manufacturers. *Id.* at 589 n. 14. Indeed, some commentators anticipate that the Class Action Fairness Act of 1995, Pub.L. No. 109–2, 119 Stat. 4 (2005), may "generate more federal class actions of national scope[,] resulting in more multi-district litigation .... " Gary L. Sasso & Carlton Fields, *Defense of Federal Regulation Class Actions,* 728 PLI/Lit. 95, 162 (2005). *But see infra* note 9 and accompanying text.

The MDL process relies on the "informed discretion of the judiciary." H.R.Rep. No. 90–1130 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898, 1901; Barry, 64 Def. Couns. J. at 58 (noting that MDL requires "strong and creative action from transferee judges").

> Over the past decades, judges have gained *increasing authority* over the pretrial process and the configuration of lawsuits themselves. One source of that control ... is the ability of judges to insist that litigants combine their actions, by consolidation and *multi-district litigation,* so that the judiciary can consider related problems together. This

increased judicial authority has come at the expense of the autonomy of at least lawyers, if not also their clients.

Judith Resnik, *Whose Judgment? Vacating Judgments, Preferences for Settlement, and The Role of Adjudication at the Close of the Twentieth Century,* 41 U.C.L.A. L.Rev. 1471, 1485–86 (1994) (emphasis added, footnotes omitted); *see also In re Showa Denko K.K. L–Tryptophan Prods. Liab. Litig.-II,* 953 F.2d 162, 165–66 (4th Cir.1992) (resolving a "serious question" by ruling that MDL transfers in no way expand a court's jurisdiction so as to allow them to reach those not a party to a case).[3]

The Judicial Panel on Multidistrict Litigation acted upon 22,516 civil actions pursuant to 28 U.S.C. 1407 during the 12–month period ending September 30, 2004. The Panel transferred 10,681 cases originally filed in 91 district courts to 46 transferee districts for inclusion in coordinated or consolidated pretrial proceedings for 11,835 actions previously initiated in the transferee districts.... The Panel did not order transfer in 29 newly docketed litigations involving 268 actions.

Since the Panel's creation in 1968, it has centralized 211,317 civil actions for

---

**3.** Though MDL practice does serve a purpose, it is certainly not without problems. Kyle, 175 F.R.D. at 589 (noting that "while Panel action may serve a 'greater litigation good' and meet strong national needs of system-wide judicial economy, those 'macro-litigation benefits' are not always universally celebrated"). The criticisms of MDL are many:

- "[T]here is no authority for trial of the mass tort case;"
- "[I]t does not resolve state court cases;"
- "[I]t hampers settlement because of the numbers of parties and difficulty in maintaining confidentiality;"
- "[B]ecause of the individual character of claims involving mixed issues of law, pretrial MDL coordination cannot accommodate a global resolution of cases."

Wood, 54 Food & Drug Law J. at 337 (footnotes omitted). It is also observed that "in the rush to file cases, baseless claims may be filed." Lawrence T. Hoyle, Jr. & Edward W. Madeira, Jr., *"The Philadelphia Story": Mass Torts in the City of Brotherly Love,* 2 Sedona Conf. J. 119, 145 (2001). Additionally, MDL often gives rise to choice of law issues. Elizabeth J. Cabraser, *Certification of Non–Federal Question Claims in Federal Courts: Strategies for Plaintiffs,* 679 PLI/Lit. 29, 73 (2002). Further still, MDL fails to "address the problem of competing class actions in different states, or in both federal and state courts." Hon. Lee H. Rosenthal, *Proposals for Further Study: The Reporter's Call for Comment,* Ass'n of Trial Law. of Am., Winter Convention Ref. Materials at 333 (2002).

pretrial proceedings. As of September 30, 2004, a total of 10,899 actions had been remanded for trial, 389 actions had been reassigned within the transferee districts, and 136,070 actions had been terminated in the transferee courts. At the end of this fiscal year, 63,959 actions were pending throughout 54 transferee district courts.

Leonidas Ralph Mecham, *Judicial Business of the United States Courts, 2004 Annual Report of the Director* 25, *available at* http://www.uscourts. gov/judbususc/judbus .html (last visited Jan. 29, 2006). Certain conclusions follow obviously from these statistics:

First, the MDL panel itself overwhelmingly favors the procedure it administers. Thus, once the MDL panel decides to consider a matter pursuant to Section 1407(a), transfer is more than likely.

Second, as compared to the processing time of an average case, MDL practice is slow, very slow. See Christopher J. Roche, *A Litigation Association Model to Aggregate Mass Tort Claims for Adjudication*, 91 Va. L.Rev. 1463, 1469 (2005) ("[D]elay is a common feature of mass tort

litigation. Resolution of cases may take years, in some cases effectively precluding plaintiffs from any meaningful recovery."). Despite the assumption that "transfer and consolidation will promote judicial efficiency which will result in convenience to the parties and witnesses", Stanley J. Levy, *Complex Multidistrict Litigation and the Federal Courts*, 40 Fordham L.Rev. 41, 47 (1971), the purported "efficiency gains of consolidated trial are not supported by reality", Benjamin W. Larson, Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach: *Respecting the Plaintiff's Choice of Forum*, 74 Notre Dame L.Rev. 1337, 1364 (1999).

Third, as MDL practice flourishes, many cases are transferred out of their home courts and away from local juries, but few—very few—ever return for trial. The reasons are twofold. Most cases settle, and this is as it should be. MDL cases settle at approximately the same rate as cases handled in their home courts. Yet the "settlement culture"[4] for which the federal courts are so frequently criticized is nowhere more prevalent than in MDL practice. The *Manual for Complex Liti-*

---

**4.** The shift from trials as the central icon of the federal courts to a "settlement culture" may be said to trace back to the tenure of Chief Justice Warren E. Burger. *See Chief Justice Highlights Needs and Achievements in Year–End Report*, Third Branch, Feb. 1984, at 1, 10 (calling for increased use of arbitration); *see also* Martin J. Newhouse, *Some Reflections on ADR and the Changing Role of the Courts*, Boston Bar J., Mar./Apr.1995, at 15, 17 ("[F]ormer Chief Justice Burger has consistently been a vocal advocate of ADR . . . ."). It reached its apogee during the period 1990–1995, when the Hon. William W. Schwarzer was Director of the Federal Judicial Center. A distinguished judge and author, *see e.g.*, William Schwarzer, *Managing Civil Litigation: The Trial Judge's Role*, 61 Judicature 400 (1978), Judge Schwarzer is an outspoken advocate of managing toward settlement.

For criticism of this view, see Judith Resnik, *Managerial Judges*, 96 Harv. L.Rev. 374,

424 (1982). *See also* David S. Clark, *Adjudication to Administration: A Statistical Analysis of Federal District Courts in the Twentieth Century*, 55 S. Cal. L.Rev. 65 (1981); Owen M. Fiss, *Against Settlement*, 93 Yale L.J. 1073 (1984); Owen M. Fiss, *The Bureaucratization of the Judiciary*, 92 Yale L.J. 1442 (1983); Owen M. Fiss, *Out of Eden*, 94 Yale L.J. 1669, 1673 (1985); Kenneth P. Holland, *The Twilight of Adversariness: Trends in Civil Justice*, in Philip Dubois, ed., *The Analysis of Judicial Reform* 17 (1982); Dale Arthur Oesterle, *Dangers of Judge–Imposed Settlements*, 9 Litig. 29 (Spring 1982); Dale Arthur Oesterle, *Trial Judges in Settlement Discussion: Mediators or Hagglers?*, 9 Cornell L. Forum 7 (1982); Stephan Landsman, *The Decline of the Adversary System: How the Rhetoric of Swift and Certain Justice Has Affected Adjudication in American Courts*, 29 Buffalo L.Rev. 487 (1980); Carrie Menkel–Meadow, *For and Against Settlement: For What Purpose the Mandatory Settlement*

*gation* seems virtually to command this result:

> One of the values of multidistrict proceedings is that they bring before a single judge all of the federal cases, parties, and counsel comprising the litigation. They therefore afford a unique opportunity for the negotiation of a global settlement. Few cases are remanded for trial; most multidistrict litigation is settled in the transferee court. *As a transferee judge, it is advisable to make the most of this opportunity and facilitate the settlement of the federal and any related state cases.*

Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 20.132 (emphasis added).

*Conference?*, paper presented at the Annual Chief Justice Earl Warren Conference on Advocacy in the United States, Charlottesville, Va. (June 26–30, 1985) at 14; Arthur R. Miller, *The Adversary System: Dinosaur or Phoenix?*, 69 Minn. L.Rev. 1, 30–35 (1984). *But see* D. Marie Provine, Report, *Settlement Strategies for Federal District Judges*, Federal Judicial Center (1986) (criticizing academics and praising "settlement-oriented judges" who have a "fundamental commitment to enhancing settlement opportunities in federal courts").

Today, there is something of a judicial backlash against making settlement the central goal of our federal court processes. The District of Massachusetts is called a "pocket[ ] of resistance" to the settlement culture. Marc Galanter, *The Hundred–Year Decline of Trials and the Thirty Years War*, 57 Stan. L.Rev. 1255, 1273 & n. 63 (2005). I trace this reawakening of interest in our traditional trial processes to a moving speech given on April 26, 2003 to the annual meeting of chief district court judges by Hon. Joseph F. Anderson, Jr., Chief Judge of the District of South Carolina. Chief Judge Anderson there issued a powerful call to devote ourselves to the core function of the judicial office—the fair and impartial trial of cases. *See also* Hon. Joseph F. Anderson, Jr., *Jury Service as the 'Palladium of Liberty'*, The State (Columbia, S.C.), Aug. 8, 2004. Alex Sanders, one of America's foremost jurists, minces no words:

> Trial judges should return to being trial judges, instead of docket managers. They should start treating jury trials as a vindication of the justice system rather than a failure of the justice system. They should revere and respect the jury trial as the centerpiece of American democracy.

Alex Sanders, former Chief Justice, South Carolina Court of Appeals and former President of the College of Charleston, *Ethics Beyond the Code: The Vanishing Jury Trial*, Address to the Am. Trial Law. Ass'n (Dec. 2, 2005); *see also* Ad Hoc Comm. on the Future of the Civil Trial of the Am. Coll. of Trial Law., *The "Vanishing Trial:" The College, The Profession, The Civil Justice System*, 226 F.R.D. 414 (2005) ("The number of civil trials in federal court over the 40 years from 1962–2002 has fallen, both as a percentage of filings and in absolute numbers.... These numbers are particularly startling in light of the enormous increase in litigation over the same 40 year period."); Hon. Patrick E. Higginbotham, *So Why Do We Call Them Trial Courts?* 55 SMU L.Rev. 1405 (2002) (expressing his "concern over trial numbers" and noting "the decline in trials" and "the attending decline in participation of lay citizens ... in our justice system"); John W. Keker, *The Advent of the "Vanishing Trial": Why Trials Matter*, The Champion (Sept./Oct. 2005) 32, 33 ("Judges led the charge to fewer trials and now they regret it."); Nathan Koppel, *Trial-less Lawyers: As More Cases Settle, Firms Seek Pro Bono Work to Hone Associates' Courtroom Skills*, Wall St. J., Dec. 1, 2005, at B1, (quoting Judge David Hittner—"we are losing sight of the basic right to trial by jury",—and Professor Marc Galanter—as "more and more judges begin to say, 'We are really losing the trial as a societal institution,' many of them become less prone to push for settlements"); Leonard Post, *79% Decline: Federal Tort Trials Continue a Downward Spiral: Increased Use of ADR, Better Case Management Cited*, Nat'l L.J., Aug. 22, 2005, at 7 (quoting Professor Stephen Burbank as saying "federal judges now give more attention to case management and nontrial adjudication than they give to trials" and that "it is quite clear that 'trial' judges ought to spend more time on that activity from which [their] name is taken"); Hon. William G. Young, *An Open Letter to U.S. District Judges*, Fed. Lawyer, July 2003, at 30.

Thus, it is almost a point of honor among transferee judges acting pursuant to Section 1407(a) that cases so transferred shall be settled rather than sent back to their home courts for trial. This, in turn, reinforces the unfortunate tendency to hang on to transferred cases to enhance the likelihood of settlement. Indeed, MDL practice actively encourages retention even of trial-ready cases in order to "encourage" settlement. *See, e.g.*, MDL No. 875 (subjecting thousands of asbestosis cases to MDL practice for over fourteen years). "The Panel is reluctant to order remand absent a suggestion of remand from the transferee district court." R. Proc. Jud. Panel Multidistrict Litig. 7.6(d). There are no public figures evidencing how often, if ever, the Panel has remanded a case over the objection of the transferee judge.

Although the Supreme Court has made clear that it was never the statutory intent that Section 1407(a) be interpreted as a super-venue statute allowing transfer for all purposes to the transferee judge, *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998), the Federal Judicial Center has long considered it "[a] major deficiency in MDL procedure . . . that the panel does not have statutory authority to transfer cases for trial." Thomas E. Willging, Report, *Trends in Asbestos Litigation*, Federal Judicial Center (1987). The Judicial Conference has lobbied[5] for legislation "which would effectively overrule *Lexecon* by statutory amendment." Hon. Wm. Terrell Hodges, *Chair of Judicial Panel Sees Role as Gatekeeper*, The Third Branch, Nov. 2005, at 10 ("Hodges Interview"). Indeed, the chair of the MDL Panel could not be more straightforward:

> We're hopeful that in this Congress the legislation will pass and that *Lexecon* will be a thing of the past. It's hard to know how many multidistrict dockets actually have been affected in some substantial way by the requirement of *Lexecon* that constituent actions be remanded to the transferor courts as soon as the case is ready for trial. A number of devices, frankly, have been utilized by innovative judges since *Lexecon* to minimize its effect.

*Id.* at 12.

Put aside the rather novel scene of the chair of an inferior tribunal denigrating a decision of the Supreme Court of the United States. The more important point is that the pursuit of settlement without offering a trial is both unwise—and a defense ploy.

Some, believing that any settlement is preferable to any trial, may consider this a desirable outcome.[6] In actuality, however,

---

**5.** While it is, of course, appropriate and necessary for the judiciary to speak out on matters of judicial administration, *see* Canon 4, Code of Conduct for United States Judges (2000), at least one commentator has been highly critical of such efforts to the extent they may affect substantive rights, *see* Judith Resnik, *The Programmatic Judiciary: Lobbying, Judging, and Invalidating the Violence Against Women Act*, 79 S. Cal. L.Rev. 269, 269–276 (2000).

**6.**

I was a law clerk for a trial judge who hated trials. I describe her as a trial judge .

for the irony, and because conducting trials was part of her job description. In reality, however, a "coerced settlement" or "enter-my-courtroom-and-I'll-make-you-pay" or "anti-trial" judge would be a more accurate moniker. This jurist was happiest in her business suit, at her desk in chambers, in conference with trial attorneys, cajoling and imploring and yelling. She was never thrilled to find herself draped in a robe, in a courtroom, sitting on high.

The judge's distaste for trials was a bit about efficiency, but not much. . . . The judge's problem with trials was more spiritual: she didn't believe in them. Trials

this marginalization of juror fact finding [7]

perversely and sharply skews the MDL

created "win/lose" scenarios, whereas the judge thought that "win/win" or "not win so much/not lose so much" were possible and better alternatives. With trials, outcomes are contingent on unpredictable jurors and wooden rules of evidence. And yes, trials cost money and, especially, time. In the judge's view, their costs far outweighed their benefits. Paul Butler, *The Case for Trials: Considering the Intangibles*, 1 J. Empirical Legal Stud. 627, 627–28 (2004). "[One] federal district judge stated that he regarded the eight percent trial rate as evidence of 'lawyers' failure.'" Judith Resnik, *Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III*, 113 Harv. L.Rev. 924, 925 (2000) (discussing trial judges who espouse the viewpoint that settlements are preferable to trials). "Trials, to an increasing extent, have become luxury.... When cases are handled in a package or group instead of one at a time, it is hard, if not impossible, for the lawyers or the judge to maintain time-honored concepts of due process and the adversary system. Hon. Edwin Ludwig, *The Changing Role of the Trial Judge*, 85 Judicature 216, 217, 253 (2002).

7. Abandonment of a fact-finding process signals a breakdown in America's adversary system. This is not always to be avoided. The adversary process has its limits. As a society, we have already abandoned the adversary system in labor disputes and issues involving the dissolution of marriage, preferring instead almost any solutions that will accommodate a continuing modus vivendi.

As the text demonstrates, in MDL practice fact finding generally appears far less important than forging some global settlement. Nor is this the only area once reserved for jury determination where today federal judges advance what they perceive to be more compelling goals than allowing our citizens independently to ascertain the facts. Such misguided efforts generally meet with disappointing results.

In the area of patent law, for example, jury fact finding has been supplanted in favor of judicial law declaring on the issues of how the skilled artisan would read the words of a patent claim, *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *but see* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Liti-gation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L.Rev. 982, 1086–88 (2003), and whether a patent applicant who amends a claim intends to abandon matters earlier claimed, *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359 (Fed.Cir.2003) (en banc); *but see Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 287 F.Supp.2d 126, 134–36 (D.Mass.2003). Law declaring as to matters that are situational and case-specific is a recipe for disaster, however, as law declaring is a matter for precise analysis unaided by considerations of the burden of proof. A judge is duty-bound to adhere to her independent view of the law. She may be persuaded, but she owes deference only to a higher court and may never compromise. It is perhaps no accident, therefore, that having virtually abandoned any deference to the jury's fact-finding role, patent litigation is the slowest and most expensive litigation in the United States, with a district court reversal rate that once reached 42%. This argument is more fully developed in William G. Young, *Ruminations on the Vanishing Trial: The Role of the Federal Circuit and the Fact Law Distinction*, N.Y. Intellectual Prop. L. Ass'n (Jan. 13, 2006).

The most striking abandonment of jury fact finding is found in the area where one would last expect it—our criminal laws.

[Federal] criminal trials [are] rare events. Trials are the system's Potemkin village, a piece of pretty scenery for display on Court TV while real cases, and lives, are disposed of more casually off-camera.

That effect leads to another: a sharp decline in transparency. In a healthy system, the law is what it appears to be. The rules applied in court are the same as the rules on the street, and courts apply those rules often enough that citizens can tell what they are. In our system, substantive law is a tool for evading inconvenient procedures, and courtrooms are used for guilty pleas. [Federal c]riminal punishment is allocated behind closed doors, where the lawyers dicker over charges and sentences. Criminal codes do not describe the behavior that will actually land one in a prison cell, and sentencing rules do not accurately predict how long one will stay there. Instead, the law of crimes and sentences serves as a menu of threats for police and bargaining options for prosecutors. The real law—the

law that governs individual cases—arises from discretionary decisions to order off the menu: police officers' arrests and lawyers' plea bargains. That law is invisible to outsiders.

William J. Stuntz, *The Political Constitution of Criminal Justice*, 119 Harv. L.Rev. 780, 817–18 (2006) (footnotes omitted).

Reflecting the triumph of plea bargaining over trial, George Fisher, *Plea Bargaining's Triumph*, 109 Yale L.J. 857 (2000), federal courts today routinely make the most crucial decisions about a citizen's liberty on a "mishmash of data including blatantly self-serving hearsay largely served up by the [government]." *United States v. Green*, 346 F.Supp.2d 259, 280 (D.Mass.2004), *vacated in part by United States v. Yeje–Cabrera*, 430 F.3d 1 (1st Cir.2005), *and vacated and remanded by United States v. Pacheco*, 434 F.3d 106 (1st Cir.2006). Indeed, the parties may freely bargain for an alternate reality that renders the rhetoric about "real offense sentencing", U.S. Sentencing Commission, *Federal Sentencing Guidelines Manual* 4–5 (2005), mere sophistry and bears so little relation to the facts as to mock our trial processes. Make no mistake. Whatever the Attorney General may say, *see* Amie N. Ely, Note, *Prosecutorial Discretion as an Ethical Necessity: The Ashcroft Memorandum's Curtailment of the Prosecutor's Duty to "Seek Justice"*, 90 Cornell L.Rev. 237, 252–59 (2005), the bargaining over facts continues apace, even in the wake of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). *See, e.g., United States v. Bleidt*, No. 05–CR–10144–WGY, Plea Hearing (Dec. 5, 2005) (aged and vulnerable nature of many victims omitted to secure plea); *United States v. Fuller*, No. 05–CR–10082–WGY–2, Plea and Sentencing Hearing (Nov. 16, 2005) (fraud loss amount understated to secure plea); *United States v. Montilla*, No. 04–CR–10160–WGY–3, Sentencing Hearing (Oct. 18, 2005) (drug quantity understated to secure plea); *United States v. Siciliana*, No. 04–CR–10372–WGY–1, Plea Hearing (Sept. 6, 2005) (same); *United States v. Arco*, No. 04–CR–10372–WGY–2, Plea Hearing (Sept. 6, 2005) (same). Moreover, the First Circuit embraces a regime in which such omissions are never brought to the attention of the judge. *United States v. Yeje–Cabrera*, 430 F.3d 1, 27–30 (1st Cir.2005) ("[T]he costs of monitoring compliance with ... a mandatory [factual] disclosure system are high, and many of the efficiencies created by plea bargaining would be lost.... [Fact bargaining, therefore,] transgresse[s] no norm, constitutional or legal.").

Judicial efforts to enhance the fact-finding process are met with resistance from a government that considers such efforts to be an "unfair obligation on [it]". *United States v. Duverge*, No. 05–CR–10265–WGY–1, Mot. to Recons. Re Proof of Enhancements [Doc. No. 37] (concerning trial and sentencing procedures). Of course, "[i]f fact bargaining is acceptable, then the entire moral and intellectual basis of the Sentencing Guidelines is rendered essentially meaningless. If 'facts' don't really matter, neither does 'judging' contribute anything ...." *Berthoff v. United States*, 140 F.Supp.2d 50, 67 (D.Mass.2001), *aff'd* No. 94–1714 (1st Cir. Nov. 29, 1995).

Fact finding is slow, labor intensive, and precise. It is also just—as just as any human endeavor in human history. The passing of the judicial interest in fact finding is the major reason that average on-bench time among active district judges has declined from 790 hours in 1980 to 490 hours in 2002. Federal Judicial Center, Chart, "Average Trial and Nontrial Time Reported on the JS–10 by Judges Who Were Active District Judges All Year and Reported Time for at Least 11 Months" (on file with the Court).

The eclipse of fact finding foreshadows the twilight of judicial independence. In patent law, fact finding is eschewed because the "fair preponderance" and "clear and convincing" standards are considered imprecise compared to case-specific judicial "law" declaring. As a result, United States patent litigation is the slowest and most expensive litigation in the world and its trial outcomes more uncertain than any other type of case. We denigrate fact finding in our criminal justice system in favor of plea bargaining and add "additional sentencing penalties for trial", Alexandra Natapoff, *Speechless: The Silencing of Criminal Defendants*, 80 N.Y.U. L.Rev. 1449, 1459 (2005), with the result that "[t]he federal system ... punish[es] trials so severely that the results do not deserve public confidence", Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. Penn. L.Rev. 79, 155 (2005). And we denigrate fact finding in MDL practice in favor of global settlements with the result that the adversary process is skewed in favor of the rich and the powerful.

Yet "[f]acts are stubborn things," *Rex v. Wemms* (John Adams's summation on behalf of the British soldiers accused of the "Boston Massacre"), *in* Hiller B. Zobel, *The Boston*

bargaining process in favor of defendants. Consider: All litigants bargain in the shadow of trial. Those averse to the inevitable uncertainties of the direct democracy of the American jury will factor the risks of trial into their settlement postures. Failure to arrive at a mutually acceptable settlement should, and in most cases does, result in a trial. In MDL practice, however, it is solely the transferee judge who controls the risk of trial. The litigant who refuses to settle can never get back to his home court to go before a local jury unless the transferee judge agrees.

Once trial is no longer a realistic alternative, bargaining shifts in ways that inevitably favor the defense. After all, a major goal of nearly every defendant is to avoid a public jury trial of the plaintiff's claims. Fact finding is relegated to a subsidiary role,[8] and bargaining focuses instead on ability to pay, the economic consequences of the litigation, and the terms of the minimum payout necessary to extinguish the plaintiff's claims. Commentators generally agree that MDL practice favors the defense.

MDL proceedings are described as a "delaying tactic used by defendants" which "consume a great deal of time." Benjamin W. Larson, Comment, *Lexecon, Inc. v. Milberg Weiss Beshad Hynes and Lerash: Respecting the Plaintiff's Choice of Forum,* 74 Notre Dame L.Rev. 1337, 1364 (1999) (citing Mark Hermann, *To MDL or Not to MDL? A Defense Perspective,* Litig., Summer 1998, at 43, 46; Stanley J. Levy, *Complex Multidistrict Litigation and the Federal Courts,* 40 Fordham L.Rev. 41, 50 (1971)). Plaintiffs lose control over the management of their case. Wood, 54 Food & Drug L.J. at 337.

[A] plaintiff's motive in pleading to secure a particular jurisdiction may not be evaluated in the removal versus remand struggle. In response to this forum shopping, defense counsel have often filed a notice of removal alleging fraudulent joinder of the nondiverse defendant. *Before a plaintiff has the opportunity to file a motion to remand, defense counsel often initiates a reference to the Judicial Panel averring that the case is pending in a United States district court. If, as a result of this reference, the Judicial Panel enters a transfer order, or a conditional transfer order, the plaintiff's counsel may face a David and Goliath situation.* Upon receipt of a conditional transfer order or a tag-along transfer order, many plaintiffs' counsel certainly understand David's fears in the face of Goliath.

Mike Roberts, *Multidistrict Litigation and the Judicial Panel, Transfer and Tag–Along Orders Prior to a Determination of Remand: Procedural and Substantive Problem or Effective Judicial Public Policy?,* 23 Memphis St. U.L.Rev. 841, 842–43 (1993) (emphasis added, footnotes omitted). This "strategy allows the defense counsel to attempt to secure a

---

*Massacre* 293 (1970), and a judicial system cannot long continue to command the respect and moral authority of the people it serves unless the judicial edicts are actually based on facts—facts found by American juries wherever the Constitution so commands.

**8.** It can be argued that the appalling attorney misconduct castigated by Judge Janis Graham Jack in *In re Silica Prods. Liab. Litig.,* 398 F.Supp.2d 563 (S.D.Tex.2005), is, in part, a consequence of counsel's belief that their

transparently fraudulent proffered silicosis diagnoses would never be tested by cross-examination in the crucible of trial, but were, instead, nothing more than a bargaining chip in settlement negotiations. *See* Thomas A. Donovan, *Can the Courts Prevent Being Used as an Instrument to Perpetuate Fraud?,* Fed. Law., Nov./Dec.2005, at 5, 7 (suggesting that the sprawling and unresolved asbestosis MDL suffers from the same infirmities); Peter Geier, *'Sea Change' in Asbestos Torts is Here,* Nat'l L.J., Oct. 31, 2005, at 1 (same).

transfer order or conditional transfer order before the original federal district court determines, and in some cases even hears, the anticipated motion to remand." *Id.* at 843.

This case illustrates this problem. The defendants here removed the action to federal court. Though this Court was able to rule on the motion to remand, it did not have sufficient time to issue a memorandum explaining its order prior to the conditional transfer order. Judge Hodges is, of course, correct when he says, "Well, of course some parties want centralization; some don't", Hodges Interview at 10, but a more accurate statement would be "Defendants generally want centralization; plaintiffs generally don't."

It is precisely because MDL practice is perceived so clearly to favor the defense that Congress appears to have lost confidence in a judicial management mechanism that once had such great promise. The Class Action Fairness Act of 2005, Pub.L. No. 109–2, 119 Stat. 4 (2005), itself thought to be legislation that favors business defendants, *see Natale v. Pfizer, Inc.,* 379 F.Supp.2d 161, 164–68 (D.Mass.2005), contains an unmistakable rebuke to the Panel on Multi–District Litigation in Section 4, which provides that no class action removed to federal court under its provisions shall thereafter be transferred to another district pursuant to Title 28, Section 1407(a) of the U.S.Code without the request of a majority of plaintiffs.[9] *See* Pub.L. No. 109–2, 119 Stat. 4, 11–12 (2005) (codified at 28 U.S.C. § 1332(d)(11)(C)(i)).

Were transferee judges content to work-up transferred cases for trial on a reasonably short time schedule, sensitive to the fact-finding contributions to be made by the American jury in the district where congressionally mandated venue is proper—while at the same time exerting every effort to settle all those cases amenable to settlement—perhaps MDL practice might earn back the respect it has lost.

A shining example of this technique is Judge Jack. *See supra* note 8. Another is Judge Eldon Fallon of the Eastern District of Louisiana, the transferee judge for the federal lawsuits involving Vioxx:

> At last count, Merck faced close to 7,000 lawsuits related to Vioxx, and the number keeps growing. Two judges will play critical roles in how these cases play out. One is ... U.S. District Judge Eldon Fallon of New Orleans.
>
> Fallon has control of all the federal Vioxx lawsuits, and he is hearing the case that starts in Houston today.... Today's trial is the first of four Vioxx trials Judge Fallon has scheduled for the next few months. The four cases are intended to represent the range of alleged harms caused by Vioxx.
>
> Fallon is following a strategy he's used before to push plaintiffs and drug makers to the settlement table, by *trying* representative cases and letting their outcomes *in court* set a price tag for an overall settlement. He's doing this despite Merck's insistence that it will not settle and that the company will take every case to court.

.      .      .      .      .

9.   *See also* Myriam Gilles, *Opting Out of Liability: The Forthcoming, Near–Total Demise of the Modern Class Action,* 104 Mich. L.Rev. 373, 375 (2005) ("[I]n the ongoing and ever-mutating battle between plaintiffs' lawyers and the protectors of corporate interests, the corporate guys are winning. And they are winning because they have developed a new set of tools powerful enough to imperil the very viability of class actions in many—actually, most—areas of the law. In fact, I believe it is likely that, with a handful of exceptions, class actions will soon be virtually extinct.").

Judge Fallon has promised a speedy trial.[10]

Snighda Prakash, *Federal Trial on Vioxx Opens in Houston*, NPR Morning Edition, Nov. 29, 2005 (emphasis added), audio recording *available at* http://www. npr.org/templates/ story/story.php? storyId=5030553 (last visited Jan. 30, 2006).

## II. Multi–District Litigation Practice in This Case.

This case illustrates how all this works in America today. Dean Delaventura ("Delaventura") commenced this putative class action on March 21, 2005 in the Massachusetts Superior Court sitting in and for the County of Suffolk on his own behalf and on behalf of others similarly situated. *See* Notice of Removal [Doc. No. 1], Ex. A. Seeking to avoid federal court and MDL practice, the complaint stated a single cause of action for breach of contract. The defendants Columbia Acorn Trust and Columbia Funds Trusts I–IX ("Colum-

bia"), alleging that this complaint was preempted by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub.L. 105–353, 112 Stat. 3227 (1998) (codified in scattered sections of 15 U.S.C.), removed this matter to federal court from the Suffolk Superior Court on April 20, 2005. *See* Notice of Removal. Columbia also filed a motion to stay the proceedings while it pursued its efforts to fold this case into an already existing MDL docket involving "market timing" issues. Mot. to Stay [Doc. No. 5] at 2. Delaventura opposed the motion to stay, *see* Mem. in Opp'n to Mot. to Stay [Doc. No. 7], and filed a motion to remand the matter to state court on June 6, 2005, Mot. to Remand [Doc. No. 8]. Columbia filed an opposition to the motion to remand. Mem. in Opp'n to Mot. to Remand [Doc. No. 14] ("Columbia Opp'n"). The parties filed respective reply briefs. [Doc. Nos. 13, 15]. This Court granted an expedited hearing,

**10.** Apparently Judge Fallon doesn't mess around:

> Unlike the two previous state-level cases …, the federal case before U.S. District Judge Eldon Fallon of New Orleans got off to a quick start.
>
> It took less than two hours to pick a jury …. Opening statements for the plaintiff … took less than an hour and Merck's opening didn't take much longer.

"1st Federal Vioxx Trial Focuses on Fla. Man's Death," *The Boston Globe*, Nov. 30, 2005, at D2.

Many hard-working transferee judges are, of course, comparable to Judges Jack and Fallon in their drive to get cases to trial, yet are hesitant to return them to their home districts because they fear increased delay stemming from the time necessary for the hometown judge to come up to speed on a complex case with many nuances, or because they fear that, as the hometown court is swamped with judicial business, the returned case will go to the bottom of the pile. These judges see legislative repeal of *Lexecon* as a way more efficiently to allocate judicial business among the 94 district courts. Conversa-

tion with Hon. Kathleen M. O'Malley (Jan. 23, 2006).

While these observations have bite, are they sufficient to support the profound step of a nationwide venue for MDL cases, largely at the option of defendants? More modest steps might achieve the same ends without marginalizing hometown juries: e.g., the MDL panel could centralize cases in districts which have the largest number of pending actions to facilitate the trial of exemplar cases; transferee judges could be encouraged to work more closely with transferor judges to see that exemplar or ripe cases come promptly to trial; or—though this is well above the call of duty—the transferee judge could receive an intercircuit assignment to try the case in the hometown district. *See* Hodges Interview at 12. The federal courts' videoconferencing system can, to a certain degree, make this more palatable. *See, e.g., United States v. Mazzeo*, 306 F.Supp.2d 294, 303 n. 5 (E.D.N.Y.2004); *Andrea Doreen, Ltd. v. Building Material Local Union 282*, 299 F.Supp.2d 129, 135 n. 6 (E.D.N.Y.2004); *Andrea Doreen, Ltd. v. Building Material Local Union 282*, 250 F.Supp.2d 107, 110–11 n. 4 (E.D.N.Y.2003).

held on June 14, 2005. *See* Electronic Clerk's Notes (June 14, 2005).

Delaventura had moved to remand the matter to state court, asserting that his class action suit "allege[d] a single cause of action for breach of contract on behalf of certain *holders* of mutual fund shares", and that his complaint, therefore, was not preempted by SLUSA.[11] Mem. of Law in Supp. of Pl.'s Mot. to Remand [Doc. No. 9] ("Delaventura Mem.") at 1. Delaventura argued that this Court's decision in *Meyer v. Putnam Int'l Voyager Fund*, 220 F.R.D. 127 (2004), counseled remand. Delaventura Mem. at 4–5. He asserted that this case—which alleged that Columbia's market-timing activity related to certain representations and warranties included in a prospectus and thus constituted a breach of contract—resembled *Meyer*, where shareholders alleged a breach of fiduciary duty as a result of market-timing activity. Delaventura Mem. at 4. Delaventura argued that removal under SLUSA was improper, as the class action claim was not "in connection with the purchase or sale" of Columbia Mutual Fund B shares. *Id.* at 5 (arguing the claim "limits the proposed class to 'holders' of Class B shares as of February 24, 2004"). So, contended Delaventura, SLUSA should not apply nor preempt his state law claims. *Id.* at 6.

Columbia sought removal and transfer to the MDL panel, as "[t]he Federal Judicial Panel on Multidistrict Litigation has consolidated twelve of the suits with other market-timing cases in [MDL] No. 1586" and because "[a]mong the issues before the MDL Court is the scope of preemption

under [SLUSA] ..., specifically, whether particular cases within the market-timing MDL are either preempted by SLUSA or should be remanded to state court." Columbia Opp'n at 1. Columbia argued that Delaventura failed to demonstrate a reason why this market-timing case should not be heard by the MDL. Columbia Opp'n at 2. Further, Columbia argued that this Court's decision in *Meyer*, upon which Delaventura placed great weight, was decided prior to the creation of this MDL panel. Columbia Opp'n at 2. (arguing, also, that *Meyer* is distinguishable, as it involved an alleged breach of fiduciary duty rather than a breach of contract). Columbia contended that there was no good reason this matter should not be decided together with other similar matters in the MDL. *Id.* at 3, 4–7, 8–12 (citing the substantial interest in judicial economy).

At the close of the hearing, the Court denied Columbia's motion to stay and took Delaventura's motion for remand under advisement. The Court stated expressly, "If the multi-district litigation panel orders [the case] transferred[,] they'll do so over my opposition[,] which I now state on the record. I don't agree that this case be transferred." Transcript of Proceedings Held on June 14, 2005 [Doc. No. 16] at 22.[12] On the supposition that the motion to remand might be denied, the Court then proceeded to hold an initial case management scheduling conference pursuant to Local Rule 16.1, placing the case on the Court's running trial list for July of 2006.[13]

On July 28, 2005 this Court entered an order denying Delaventura's motion to re-

---

11. Delaventura likewise argued that the Investment Company Act of 1940 did not preempt his claim. Delaventura Mem. at 7–8.

12. The Electronic Clerk's Notes for this hearing state that "[i]f the MDL orders the case transferred, it will be done over the objection of this court."

13. This date is "for real." Since most cases settle, for the past seven or eight years this Court—with rare exceptions—has commenced trial of each of the cases so assigned during the assigned month.

mand. *See* Order of July 28, 2005 [Doc. No. 20]. In its order, this Court indicated that a memorandum explaining the rationale for its decision would follow. This Court had found persuasive Columbia's substantive argument that, given applicable case law, the misrepresentation claims were, in actuality, "in connection with the purchase and sale of securities" and, as such, preempted by the federal law. On August 10, 2005, however, upon application by Columbia, this matter was ordered transferred to the Northern Division of the District of Maryland, and the case before this Court was closed. *See* [Doc. No. 21].

The Judicial Panel on Multi–District Litigation follows a courteous practice of advising the district judge who may lose a case as follows: "Although the consent of the transferor judge is technically not required for a transfer under Section 1407, the Panel prefers that all participating judges agree that transfer would be for the convenience of the parties and witnesses and would promote the just and efficient conduct of the litigation." *See, e.g.,* Letter from Hon. Wm. Terrell Hodges to Hon. Rya W. Zobel (Oct. 26, 2005) (regarding MDL–1715—*In re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation*). This Court received no comparable letter in this case and does not know whether the panel was ever advised of this Court's opposition to the transfer.

### III. Conclusion

Current Muti–District Litigation practice is seriously flawed in that it is perceived to proceed not on neutral principles but in a manner that favors defendants. Were Congress to override *Lexecon*, this imbalance would be exacerbated and the already diminished role of the American jury further marginalized.

This Court's offer to try this case in July of 2006 still stands. Should the transferee court have the case ready for trial then—or any time thereafter—and be willing to return it, it will be promptly tried here in Boston.